# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 13
In the Matter of TCR Sports
Broadcasting Holding, LLP,
  Appellant,
   v.
WN Partner, LLC, et al.,
  Respondents,
Washington Nationals Baseball
Club, LLC,
  Respondent,
Baltimore Orioles Baseball Club,
et al.,
  Appellants.

Carter G. Phillips, for appellants.
Derek L. Shaffer, for respondent Washington National Baseball Club, LLC.
Kenneth R. Feinberg, Mayor and City Council of Baltimore, amici curiae.

SINGAS, J.:

New York's well-established rules of contract law, which apply to arbitration agreements, provide that courts will enforce a commercial contract between sophisticated and counseled parties according to the contract's terms. In this case, two Major League

Baseball (MLB) teams and their co-owned regional sports network are in a dispute regarding the fair market value of certain telecast rights.  By affirming the confirmation of the second arbitration award and directing that the money judgment be vacated, we hold the highly sophisticated parties to the terms of their agreement.

I.

*A.  The Settlement Agreement*

Beginning in 1972, the Baltimore Orioles Baseball Club (the Orioles) was the only MLB team located in the United States' mid-Atlantic region, which encompasses Washington, D.C. and Baltimore, Maryland.  Washington, D.C. accounted for a significant portion of the Orioles' fan base and revenue streams while the Orioles were the only team in that region.  In 2001, the Orioles and petitioner TCR Sports Broadcasting, LLC (TCR) established the Orioles' Television Network.  The network had the exclusive right to telecast Orioles games in a seven-state television territory that included Washington, D.C. (the television territory).  The next year, MLB purchased the Montreal Expos and in 2004 announced that it planned to relocate the Expos to Washington, D.C. and rebrand the team as the Washington Nationals.  The Orioles objected to this plan, contending that the Nationals' presence in the market would harm them financially.

In 2005, MLB, TCR, the Orioles, and the Nationals executed an agreement (the settlement agreement) to resolve several issues associated with the Expos' relocation to Washington, D.C.  Under the settlement agreement, TCR was converted into the Mid-Atlantic Sports Network (MASN), a two-team regional sports network.  MASN would have the exclusive right to televise the games of both the Orioles and the Nationals in the

television territory, except for games that were retained by MLB's national rights agreements. The Orioles would be MASN's managing partner and initially own 90% of MASN, while the Nationals' initial ownership stake was set at 10%. Beginning in 2010, the Nationals' stake would increase by 1% per year until it reached 33% in 2032 and, correspondingly, the Orioles' stake would decrease by 1% per year until it reached 67%. This was intended to allow the Orioles to receive reparative compensation through the distribution of profits in accordance with its supermajority. Indeed, MLB said that the settlement agreement would "protect the Orioles from any adverse effects caused by the relocation."

The settlement agreement provided that MASN must pay the Orioles and the Nationals an annual fee for the right to telecast their games and established those fees for the years 2005 through 2011. Beginning in 2007, both teams were to be paid the same amount for their telecast rights; they were paid $29 million each in 2011 for that year's telecast rights. For the years following 2011, the settlement agreement required MASN, the Orioles, and the Nationals to negotiate in good faith to set the fair market value of the telecast rights fees in five-year increments.

The telecast rights fees are MASN's largest expense and, thus, the amount of those fees affects MASN's profitability. As noted, MASN must pay the Orioles and the Nationals the same amount for their annual telecast rights. The teams therefore share equally MASN's payment of telecast rights fees. However, MASN's profits are split in proportion to the teams' ownership shares, with the Orioles retaining its supermajority share. MASN's ownership arrangement therefore incentivizes the Orioles to favor lower

telecast rights fees to maximize MASN's profits, while encouraging the Nationals to advocate for higher fees.

The settlement agreement set forth a three-step procedure for resolving telecast rights fees disputes: (1) a 30-day mandatory negotiation period; (2) if negotiation failed, non-binding mediation before one of two designated forums; and (3) if mediation failed, MLB's Revenue Sharing Definitions Committee (the RSDC) would determine the fair market value of the telecast rights fees.[1]  The RSDC is an MLB standing committee composed of three representatives from MLB teams, with rotating membership.  It is typically tasked with analyzing transactions, including telecast agreements, for purposes of determining compliance with MLB's revenue-sharing plan.  In the settlement agreement, the parties agreed that the RSDC would use its established methodology to value the telecast rights.  The agreement also provided that the RSDC's determination would be final and binding and that the parties could seek to vacate an award only on certain grounds, including corruption or fraud.

When it came time to set the telecast rights fees for 2012-2016—the first five-year period contemplated by the settlement agreement—the parties failed to reach agreement.[2] MASN, using an accounting based profit margin analysis known as the "Bortz

---

[1] This provision could be read to establish an appraisal procedure, as opposed to an arbitration clause, given the settlement agreement's other terms and the RSDC's history. However, we accept the parties' unified understanding that the proceedings before the RSDC were arbitrations.

[2] The Nationals' current owners purchased the team from MLB in 2006.

methodology," proposed a telecast rights fee schedule starting at around $34 million for 2012 and rising to about $45.6 million in 2016. The Nationals, acting through their counsel, Proskauer Rose LLP, rejected that proposal. The Nationals valued their rights at more than $110 million per year on average, using a comparable markets approach.

### B.  *The First Arbitration*

After negotiations failed, the parties waived the mediation process provided for in the settlement agreement and proceeded to the third step, arbitration before the RSDC. The RSDC panel consisted of representatives from the Tampa Bay Rays, Pittsburgh Pirates, and New York Mets, who were appointed by MLB's then Commissioner of Baseball, Allan H. (Bud) Selig. MLB staff—including Robert D. Manfred, Jr., then an MLB executive vice president—administered the arbitration and provided legal and analytical assistance to the RSDC.

Proskauer represented the Nationals during the arbitration proceedings. Because Proskauer also represented MLB—as well as the Rays, Pirates, and Mets—in unrelated matters both at that time and in the past, MASN and the Orioles requested that the RSDC preclude Proskauer from participating in the proceeding. Manfred concluded that the RSDC lacked the legal authority to disqualify Proskauer, and simply granted MASN and the Orioles a continuing objection to Proskauer's involvement in the matter.

In April 2012, the RSDC held a one-day hearing at which the Nationals argued that the average fair market value for their telecast rights for 2012-2016 was about $118 million per year. MASN and the Orioles argued that the Nationals should be paid an average of about $39.5 million per year for that period. That summer, the RSDC informed the parties

that it had determined that the Nationals' telecast rights would be approximately $53 million for 2012 and would rise by about $3 million per year through 2016. However, the RSDC did not issue its decision because Selig was attempting to negotiate a broader settlement between the parties.

A year later, in August 2013, with negotiations ongoing, MLB advanced the Nationals nearly $25 million to encourage the team's continued participation in those settlement negotiations. That amount represented the difference between what the RSDC's pending award required MASN to pay the Nationals from 2012-2013 and what MASN actually paid them for those years.[3] If the parties did not settle, MLB would be repaid with proceeds from the arbitration award. Under this arrangement, "if the RSDC issue[d] a decision that cover[ed] 2012 and/or 2013, any payments from MASN otherwise due to the Nationals [would] be made first to the Commissioner's Office to cover any amounts paid." Alternatively, if MASN was sold to a third party, the $25 million would be paid to MLB as part of that transaction. Manfred signed this agreement on behalf of MLB.

The settlement negotiations ultimately failed, and the RSDC issued its decision in June 2014. As expected, the RSDC concluded that the Nationals' telecast rights fees would be approximately $53 million in 2012, rising from there to nearly $67 million in 2016.

After the RSDC issued its determination, Selig reiterated to both teams that the settlement agreement did not authorize them "to file any lawsuit" and that the MLB

---

[3] MASN paid the Nationals the amounts it had proposed to the RSDC as the fair market value of the Nationals' telecast rights.

constitution "expressly prohibited" litigation in court. Selig cautioned both teams that "if any party initiate[d] any lawsuit," he would "not hesitate to impose the strongest sanctions available" under MLB's constitution.

MASN and the Orioles nevertheless commenced this CPLR article 75 proceeding against the Nationals and MLB.[4] MASN and the Orioles sought to vacate the RSDC award under the Federal Arbitration Act (FAA) on multiple grounds, including that the process was affected by evident partiality. MASN argued, among other things, that (1) the RSDC failed to fully disclose and remedy the conflict presented by Proskauer's concurrent representation of the Nationals, MLB, and each of the RSDC panel's members or their team; (2) the $25 million advance gave MLB an impermissible stake in the outcome of the arbitration process; and (3) MLB controlled the arbitration process. MASN and the Orioles also sought to have the matter remanded for a second arbitration before a different forum unaffiliated with MLB. The Nationals cross-moved to confirm the award.

During the pendency of the litigation, Manfred was named MLB's commissioner. In media reports, Manfred was quoted as saying that he thought that the settlement agreement made clear that "the RSDC was empowered to set rights fees. That's what they did, and I think sooner or later MASN is going to be required to pay those rights fees."

---

[4] The respondents are WN Partner, LLC; Nine Sports Holding, LLC; Washington Nationals Baseball Club, LLC; the Office of Commissioner of Baseball; and the Commissioner of Major League Baseball. MASN also named the Orioles and Baltimore Orioles Limited Partnership, in its capacity as managing partner of TCR (BOLP), as nominal respondents. MASN has represented the interests of the Orioles and BOLP throughout this proceeding, and the parties filed joint briefs on this appeal.

In November 2015, Supreme Court (Marks, J.) (1) granted the amended petition to the extent of vacating the arbitration award, (2) otherwise denied the amended petition, and (3) denied the Nationals' cross motion to confirm the award. With respect to MASN's and the Orioles' evident partiality claim, the court rejected their assertion that the $25 million advance gave the RSDC or MLB "an impermissible interest in the award." The court concluded that MASN and the Orioles established evident partiality, however, because Proskauer was concurrently representing the Nationals in the arbitration, MLB in several matters, and interests associated with all three members of the RSDC panel. The RSDC's failure to address these conflicts demonstrated evident partiality and justified vacating the award. The court refused to refer the matter to a different arbitral forum, noting that re-writing the settlement agreement was "outside of its authority" under the agreement's terms. MASN and the Orioles appealed so much of the order as denied the request to conduct the second arbitration before a different forum. The Nationals cross-appealed the order insofar as it vacated the RSDC award.

The Appellate Division affirmed the November 2015 order in a per curiam memorandum, accompanied by two concurring opinions and an opinion dissenting in part (*see* 153 AD3d 140 [1st Dept 2017]). The Justices unanimously agreed that Supreme Court properly vacated the award based on evident partiality resulting from Proskauer's concurrent representation. They disagreed about whether the RSDC should preside over the second arbitration.

Justice Andrias, in a concurrence joined by Justice Richter, determined that the RSDC's award "was correctly vacated based on 'evident partiality' " under the FAA given

Proskauer's "unrelated representations at various times of virtually every participant in the arbitration except for MASN and the Orioles" (*id.* at 143 [Andrias, J., concurring]). He explained that MLB and the RSDC failed "to provide MASN and the Orioles with full disclosure or to remedy the conflict before the arbitration hearing was held" (*id.*).

This concurrence concluded, however, that there was no basis "to direct that the second arbitration be heard in a forum other than" the RSDC (*id.*). After declining to address "whether, in an exceptional case," the Court had the power under the FAA "to disqualify an arbitral forum" (*id.* at 154 n 3), the concurrence pointed out that "the sophisticated parties, represented by experienced counsel, knew full well how the RSDC operated, including that MLB would have significant influence over the arbitration process" (*id.* at 156). Further, the discrete cause of the RSDC's evident partiality, Proskauer's concurrent representation, had been remedied and MLB had appointed new members to the RSDC panel. Moreover, concerning the $25 million advance, the Nationals had "offered to post a bond to guarantee repayment . . . to MLB regardless of the outcome of the arbitration" (*id.* at 158). In these circumstances, therefore, MASN and the Orioles failed to make "the extraordinary showing of grounds needed to reform the agreement or disqualify the RSDC" (*id.* at 160).

Justice Kahn concurred separately, agreeing that "the arbitration may not be referred to another forum" but on the ground that the Court lacked power to "order that the arbitration take place in a forum other than the one selected by the parties" (*id.* at 161 [Kahn, J., concurring]). Presiding Justice Acosta and Justice Gesmer dissented in part,

concluding that the Court could "and should refer the matter to an alternative forum in the rare circumstances presented" (*id.* at 163 [Acosta, P.J., dissenting in part]).[5]

### C. The Second Arbitration

As discussed in the Appellate Division order, prior to the second arbitration, Proskauer discontinued its participation and Manfred appointed a new RSDC panel made up of executives from different teams, the Milwaukee Brewers, Seattle Mariners, and Toronto Blue Jays. The RSDC retained its own counsel.

In addition, MLB and the Nationals agreed that the Nationals would repay the $25 million advance, plus interest, at least 10 days before the second arbitration started (the prepayment agreement). If the hearing did not "commence within 14 days of its scheduled commencement," payment was to "be returned in full to the Nationals." The prepayment agreement did not relieve the Nationals of their obligation to repay the advance under the original terms if the hearing did not occur.

MASN and the Orioles continued to object to the RSDC as the arbitral forum. They requested that the RSDC recuse itself and sought copies of all communications between the RSDC and MLB concerning the dispute. The RSDC issued a procedural order denying those requests, explaining that no member was "aware of any fact or circumstance . . . that would call into question [their] independence or give rise to reasonable doubts about [their] impartiality." The RSDC concluded that the discovery requests were inappropriate

---

[5] We dismissed MASN's and the Orioles' appeal as of right from the July 2017 Appellate Division order on nonfinality grounds (*see* 30 NY3d 1005 [2017]).

because they did not focus on the merits of the dispute and because MASN and the Orioles failed to make "a threshold showing of a lack of independence or impartiality on the part of any member of the RSDC." Prior to the hearing, the Nationals repaid the $25 million advance in accordance with the prepayment agreement.

At the second arbitration hearing, the parties again proffered evidence regarding the value of the Nationals' telecast rights. In addition to the testimony presented at the two-day hearing, the parties submitted expert reports, witness statements, voluminous documentary evidence, and pre-hearing and post-hearing briefs. Relying again on the Bortz methodology, MASN and the Orioles asserted that the Nationals' license fees should average about $40.4 million per year, with fees set at $34.5 million in 2012 and rising to $44.3 million in 2016. The Nationals again used a comparable-teams valuation methodology and argued that their license fees should average around $95 million per year, with the fees set at $87.7 million in 2012 and rising to $102.6 million in 2016.

The RSDC concluded, in a 48-page decision, that the Nationals' rights should be set at approximately $55 million in 2012, rising to about $62.4 million in 2016. The average annual value was around $59.3 million. The award stated the amounts that MASN had distributed to the Nationals to date in telecast rights fees and profit distributions, but the RSDC concluded that it lacked authority to enter a judgment or award the Nationals prejudgment interest.[6]

---

[6] MASN and the Orioles directly appealed as of right to this Court from the RSDC's second arbitration award. We granted the Nationals' motion to dismiss that appeal on nonfinality grounds (*see* 34 NY3d 1011 [2019]).

The Nationals moved in Supreme Court to confirm the RSDC's second award and sought prejudgment interest. MASN and the Orioles opposed the Nationals' motion, arguing that the second award, like the first, should be vacated based on the RSDC's evident partiality. MASN and the Orioles contended that (1) the prepayment agreement provided the RSDC an incentive not to recuse itself; (2) the RSDC failed to disclose its communications with MLB; and (3) Manfred's public statements evinced bias. MASN and the Orioles maintained that Supreme Court should remand the matter for a third arbitration in a forum unaffiliated with MLB. They also asserted that Supreme Court lacked authority to grant the Nationals a money judgment or prejudgment interest.

Supreme Court (Cohen, J.), among other things, (1) confirmed the RSDC's second award and (2) directed the parties to an inquest to determine the amount of prejudgment interest to which the Nationals were entitled (*see* 67 Misc 3d 1242[A], *10 [Sup Ct, NY County 2019]). After considering MASN's and the Orioles' arguments, the court held that they failed to establish evident partiality. The court later entered judgment in the Nationals' favor for more than $105 million, which included nearly $6 million in prejudgment interest.

The Appellate Division, among other things, affirmed the judgment, holding that MASN and the Orioles failed to demonstrate evident partiality in the second arbitration proceeding (*see* 187 AD3d 623, 623 [1st Dept 2020]). The Court also rejected their argument that Supreme Court "unlawfully modified the award in its confirmation order by performing a calculation of the Nationals' damages" (*id.* at 624).

MASN and the Orioles appealed as of right on dissent grounds from the 2020 Appellate Division order, seeking review of the 2017 Appellate Division order (*see* CPLR

5601 [d]).[7]  We granted MASN and the Orioles leave to appeal from the 2020 order to review that order (*see* 37 NY3d 905 [2021]).  Both Appellate Division orders are thus before us on this appeal.

## II.

The parties agree that the FAA governs this dispute.  That statute's "primary purpose" is to "ensur[e] that private agreements to arbitrate," like other contracts, "are enforced according to their terms" (*Volt Information Sciences, Inc. v Board of Trustees of Leland Stanford Junior Univ.*, 489 US 468, 479 [1989]; *see Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith*, 85 NY2d 173, 181 [1995]).  The FAA was thus designed to place arbitration agreements "upon the same footing as other contracts" (*Volt Information Sciences, Inc.*, 489 US at 478 [internal quotation marks omitted]).  The parties control the scope and parameters of their arbitration agreement.  They generally may agree to arbitrate any issue they choose, and they can set the ground rules for the arbitration proceedings (*see id.*).  A court interprets and enforces the parties' arbitration agreement; it will not rewrite the contract or impose additional terms (*see Matter of Salvano*, 85 NY2d at 182).

Parties to an arbitration agreement typically have the right to "name those who are to be the arbitrators" or "to choose the way in which they are to be selected" (*Matter of Siegel [Lewis]*, 40 NY2d 687, 689 [1976]; *see also Sphere Drake Ins. Ltd. v All Am. Life Ins. Co.*, 307 F3d 617, 620 [7th Cir 2002], *cert denied* 538 US 961 [2003]).  In other words,

_____

[7] We denied the Nationals' motion to dismiss the appeal (*see* 37 NY3d 986 [2021]).

"the method for selecting arbitrators and the composition of the arbitral tribunal have been left to the contract of the parties" (*Matter of Siegel*, 40 NY2d at 689 [internal quotation marks omitted]). The parties may select industry insiders who have "a particular expertise" in the arbitration's subject matter and existing relationships with the parties (*id.*; *see also National Football League Mgt. Council v National Football League Players Assn.*, 820 F3d 527, 548 [2d Cir 2016]; *Sphere Drake Ins. Ltd.*, 307 F3d at 620). Given these considerations, a party's "choice of an arbitrator" is "a valuable contractual right not lightly to be disregarded" (*Matter of Astoria Med. Group [Health Ins. Plan of Greater N.Y.]*, 11 NY2d 128, 134 [1962] [internal quotation marks omitted]).

The FAA authorizes a court to vacate an arbitral award in defined instances. As relevant here, 9 USC § 10 (a) (2) permits vacatur "where there was evident partiality . . . in the arbitrators." The Second Circuit has held that " 'evident partiality' within the meaning of" section 10 "will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration" (*Morelite Constr. Corp. v New York City Dist. Council Carpenters Benefit Fund*, 748 F2d 79, 84 [2d Cir 1984]). The standard makes clear that arbitrators are not held to judicial standards, and prevents vacatur of awards based on "tenuous relationships between the arbitrator and the successful party" (*id.* at 85). This Court has "adopt[ed] the Second Circuit's reasonable person standard," applying it when we are asked "to consider the federal evident partiality standard of 9 USC § 10" (*U.S. Elecs., Inc. v Sirius Satellite Radio, Inc.*, 17 NY3d 912, 914 [2011]). Under that standard, "[t]he party seeking vacatur must prove evident partiality by clear and

convincing evidence" (*National Football League Mgt. Council*, 820 F3d at 548 [internal quotations marks omitted]; *see U.S. Elecs., Inc.*, 17 NY3d at 915).

We need not address whether a court has the power to direct that a subsequent arbitration occur before an arbitral forum not designated by the parties in their arbitration agreement after the court has vacated an arbitration award on evident partiality grounds. Here, the conflict was cabined in the first proceeding and did not irredeemably infect the RSDC as a forum. Thus, Judge Marks did not err by remitting the matter to the RSDC for the second arbitration hearing. Supreme Court vacated the RSDC's first award on evident partiality grounds because of the fact-specific conflict caused by Proskauer's concurrent representation of all the parties involved in the arbitration except MASN and the Orioles. The Nationals no longer challenge this determination. This discrete defect was remedied prior to the second arbitration once the parties, including the RSDC, retained new counsel. Further, the RSDC panel members presiding over the first arbitration were replaced by new members and, thus, the arbitrators hearing the second proceedings were not tainted by the prior concurrent representation. Remittal to a new arbitral forum was therefore unnecessary to remediate the cause of the evident partiality.

While no court has concluded that MLB's $25 million advance to the Nationals or Manfred's comments established evident partiality, MASN and the Orioles argue that those facts demonstrate that the RSDC was an improper forum to conduct the second arbitration. We disagree. The advance, made after the parties knew the RSDC's informal determination, maintained the status quo and permitted settlement negotiations to continue in hopes of ending this complex dispute. In these circumstances, MLB did not take a

financial stake in the outcome of this matter.  In any event, the Nationals agreed to post a bond covering the advance and, later, agreed to repay—and did repay—the $25 million advance before the second arbitration started.  Further, there is no evidence that MLB or Manfred had any undisclosed influence on the panel members beyond that which the parties bargained for in the settlement agreement.

Indeed, the remand to the RSDC for the second proceeding furthered the FAA's primary purpose, ensuring that arbitration contracts are enforced according to their terms. The parties specifically agreed to arbitrate telecast rights fees disputes before the RSDC, carving out an exception to the settlement agreement's general dispute resolution provisions that would otherwise govern.  MASN and the Orioles knew that MLB determined the makeup of the RSDC's panel and also knew that the RSDC was composed of MLB insiders.  The parties also specifically agreed to arbitrate before the RSDC because it possessed specialized knowledge concerning the complex telecast rights valuations at issue here and an understanding of the ramifications of its decision.  The parties agreed to an industry insider controlled process with a full understanding of the commissioner's involvement.  MASN and the Orioles cannot now complain that they received something different than what they bargained for through the insider process they selected.  We therefore decline to reform the settlement agreement on the facts presented and, instead, agree with the courts below that the remittal to the RSDC afforded MASN and the Orioles the amount of impartiality that "inhere[d] in the method they" chose (*National Football League Mgt. Council*, 820 F3d at 548).

Concerning the second arbitration award, the courts below correctly concluded that MASN and the Orioles failed to show, by clear and convincing evidence, that a reasonable person would have to conclude that the reconstituted RSDC was evidently partial. For the same reasons that the $25 million advance did not necessitate a new arbitral forum or establish evident partiality in the first arbitration, the prepayment agreement did not establish evident partiality in the second arbitration. There was also no evidence that MLB engaged in undisclosed activity to influence the RSDC panel members. Vacatur was thus unwarranted under that rationale or based on the RSDC's denial of MASN's and the Orioles' discovery demands, which were premised on that theory. Moreover, a reasonable person could conclude that Manfred's public statements did not establish evident partiality because the RSDC, not Manfred, made the final determination, and the statements could not realistically be construed as a directive to the RSDC panel members.

Although the courts below correctly confirmed the second arbitration award, the order appealed from must be modified because Supreme Court erred by awarding the Nationals prejudgment interest and rendering a money judgment in the Nationals' favor. The settlement agreement grants the RSDC the power only to determine "the fair market value" of the telecast rights fees. The parties did not agree that the RSDC could resolve disputes over nonpayment of such fees. Instead, remedies for MASN's nonpayment of those fees are governed by a different provision of the settlement agreement, which sets forth certain requirements, including a cure period. Only after that cure period expires do the Nationals "have a right to seek money damages." Further, disputes over nonpayment of the fees appear to be governed by the settlement agreement's more general dispute

resolution provisions.  Now that our courts have confirmed the RSDC's determination of the fair market value of the telecast rights, the parties must resolve any disputes over nonpayment of those fees in accordance with their agreement.  While it is unfortunate that our decision may send this protracted litigation into extra innings, that result is necessitated by the settlement agreement's terms.

In the end, these sophisticated and counseled parties agreed to arbitrate their telecast rights fees dispute before the RSDC and to follow a stated procedure concerning nonpayment of those fees.  The parties have failed to establish any basis to deviate from that contract.  Accordingly, the order appealed from and so much of the 2017 Appellate Division order brought up for review should be modified, without costs, in accordance with this opinion and, as so modified, affirmed.

Order appealed from and so much of the 2017 Appellate Division order brought up for review modified, without costs, in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Singas. Chief Judge Wilson and Judges Rivera, Garcia, Cannataro and Troutman concur.  Judge Halligan took no part.

Decided April 25, 2023